UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


ABDUL RAZZAQUE AHMED, M.D.,          )
    Plaintiff-Petitioner,          )
                    )
v.                                  )    CIVIL ACTION
                    )    NO. 09-cv-11441-DPW
KATHLEEN SEBELIUS,                  )
Secretary of the United States      )
Department of Health and Human      )
Services,                           )
    Defendant-Respondent.          )
                    )

MEMORANDUM AND ORDER
May 10, 2010

Plaintiff-Petitioner Abdul Razzaque Ahmed, M.D. filed this
action against Defendant-Respondent Kathleen Sebelius, the
Secretary of the United States Department of Health and Human
Services (the "Secretary"), seeking judicial review of a final
decision by the Department of Health and Human Services ("HHS")
revoking his Medicare billing privileges.  *See* 42 U.S.C. §
405(g).  The decision, rendered by the Appellate Division of the
Departmental Appeals Board ("DAB"), was based on Ahmed's felony
conviction for obstruction of a criminal investigation into
health care offenses in violation of 18 U.S.C. § 1518.  The
Secretary, in support of this final decision, has filed a motion
for judgment on the pleadings under Federal Rule of Civil
Procedure 12(c), or in the alternative, for summary judgment
under Rule 56.  Ahmed, seeking to have the final decision

-1-

reversed, has filed a cross-motion for judgment on the pleadings or for summary judgment.  I will grant the Secretary's motion.

## I. BACKGROUND[1]

Ahmed is a Massachusetts dermatologist who specializes in the diagnosis and treatment of autoimmune skin blistering diseases.  Prior to the commencement of the administrative action in this case, Ahmed was an approved Medicare supplier,[2] treated Medicare patients, and received reimbursements from Medicare for those treatments.

### A.   *The Medicare Program*

The Medicare program provides health insurance benefits to individuals over age sixty-five and to certain disabled persons. Social Security Act § 1811, 42 U.S.C. § 1395c.  Medicare is administered by the Centers for Medicare and Medicaid Services

---

[1] At a scheduling conference on January 19, 2010, the parties agreed to rely on the Certified Administrative Record ("Record") filed by the Secretary as part of her Answer in this action, rather than submit statements of undisputed facts pursuant to Local Rule 56.1.  My decision is limited to the Record, which neither party has asked me to enlarge or modify, except to take judicial notice of submissions in Ahmed's underlying criminal and administrative proceedings.  I did seek the parties' views regarding my consultation of the Pre-Sentence Report ("PSR") in the underlying case.  Neither party endorsed reliance upon it in this proceeding.  I have independently reviewed the PSR and find nothing material that would justify expanding the Record to include it.  Consequently, my review of the PSR plays no role in my disposition of this case.

[2] A physician is a deemed Medicare "supplier," as distinct from a Medicare "provider," a term which applies to hospitals or other facilities.  42 C.F.R. § 400.202.

("CMS"), an agency of HHS.  Congress has granted the Secretary

broad authority to issue regulations relating to the

administration of Medicare pursuant to Sections 1102 and 1871 of

the Social Security Act.  *See* 42 U.S.C. § 1302(a) (authorizing

the Secretary to "make and publish such rules and regulations . .

. as may be necessary to the efficient administration of the

functions" of Medicare); *id.* at § 1395hh(a)(1) ("The Secretary

shall prescribe such regulations as may be necessary to carry out

the administration of the [Medicare] insurance programs . . .

."). A physician wishing to participate in Medicare must first

enroll in the program to receive Medicare billing privileges and

a billing number.  42 C.F.R. §§ 424.500-.505.

To maintain billing privileges, physicians must complete the

applicable enrollment application and revalidate their Medicare

enrollment information every five years.  42 C.F.R. § 424.515.

The application requires the physician to list any "final adverse

actions" including any felony convictions.[3]  CMS also may perform

"off cycle revalidations." 42 C.F.R. § 424.515(d).

In addition, CMS has regulatory authority to revoke a

---

[3]   The current version of the Medicare Enrollment
Application for Physicians and Non-Physician Practitioners
requires enrolled suppliers "to report all Final Adverse
Actions/Convictions within 30 days of the reportable event."
Form CMS-855I, at 12, *available at*
http://www.cms.gov/cmsforms/downloads/cms855i.pdf (last visited
May 4, 2010). *See also Robert F. Tzeng, M.D.*, DAB No. 2169, at
11 n.15 (Apr. 3, 2008) (citing Form CMS-855).

physician's Medicare enrollment and billing privileges in certain instances.  42 C.F.R. § 424.535(a).  Relevant to this case is the regulation permitting revocation if, "within the 10 years preceding enrollment or revalidation of enrollment," the physician "was convicted of a Federal or State felony offense that CMS has determined to be detrimental to the best interests of the [Medicare] program and its beneficiaries." § 424.535(a)(3).

## B.   Ahmed's Criminal Activity

From 1997 through 2001, Ahmed's medical practice focused on the treatment of pemphigus and pemphigoid, two autoimmune skin blistering diseases, using intravenous immunoglobulin ("IVIg"). This treatment markedly improved – and even saved – the lives of many of Ahmed's patients.  However, during that period, Medicare authorized coverage of IVIg treatment only for pemphigus and denied coverage for pemphigoid.[4]  In early 2000, Medicare noticed that it had been paying Ahmed millions of dollars for IVIg treatments, and that many of his Medicare coverage claims cited "dual diagnoses" of pemphigus and pemphigoid.  The United States Attorney for the District of Massachusetts commenced an investigation to determine whether these diagnoses were fraudulent.

---

[4] In 2002, after the relevant time period in this case, CMS revised its coverage policy, approving the use of IVIg to treat both pemphigus and pemphigoid in certain instances.

In June 2000, Ahmed was served with a subpoena for medical records of the patients whom he had treated with IVIg.  In response, Ahmed produced ninety-four patient files, some of which he improperly supplemented with backdated documents, including correspondence and immunopathology reports that falsely diagnosed the patients with both diseases.  Ultimately, Ahmed was charged criminally in a fifteen count superceding indictment, including charges of mail fraud, health care fraud, obstruction of a criminal investigation of health care offenses, and money laundering.  On November 5, 2007, Ahmed entered into a plea agreement with the United States pursuant to which he pled guilty to Count 12, which charged obstruction of a criminal investigation of a health care offense under 18 U.S.C. § 1518;[5] the remaining charges were dismissed.

During the plea colloquy, the prosecutor recited certain evidence that would have been adduced had the case gone to trial:

> [T]he defendant produced medical records for approximately 94 patients whom he had treated with IVIg.  Many of these medical records were for patients who were Medicare insureds.  At trial, the government would have proven that the medical files produced by the defendant contained false backdated documents that had been created to falsely suggest that patients suffering from pemphigoid, the disease not covered by Medicare,

---

[5] 18 U.S.C. § 1518(a) subjects to criminal sanction "[w]hoever willfully prevents, obstructs, misleads, delays or attempts to prevent, obstruct, mislead, or delay the communication of information or records relating to a violation of a Federal health care offense to a criminal investigator. . . ."

were also suffering from pemphigus, the disease covered by Medicare for IVIg treatments.

For example, certain medical files produced by the defendant contained documents entitled immunopathology report signed by the defendant. These reports purported to show that on a certain date the defendant had performed a blood sera test in which he had found the patient had pemphigus. The evidence at trial would be that such a test had not been done and that the immunopathology report had been falsified and backdated.

Also in some of the medical files produced to the government by the defendant were letters signed by the defendant to the patient's referring physician.  At trial, the government would have shown that one of the letters in the medical file was an original letter that had been written and sent by the defendant on or about the date reflected in the letter.  In these original letters, the defendant, among other things, thanked the referring physician for sending him the patient and referred to the diagnosis as pemphigoid.

These original letters were notable in that they had no mention of the disease pemphigus.

The government would also have proven that in these medical files were false backdated letters, and that these false backdated letters purported to be an addendum to the original letter.  In these false backdated letters, the defendant falsely claimed that he had performed a serological test that indicated that the patient in question not only had pemphigoid but also had pemphigus. These second letters bore dates ranging from 1999 - - rather from 1996 through 1999.

The trial evidence would have shown that these letters were backdated and that they were, in fact, not mailed out until on or about September 11, 2000.

Judge Lindsay, to whom the criminal case was then assigned, inquired whether Ahmed "disagree[d] with anything [the prosecutor] said." Ahmed replied, "No, your Honor."

On January 8, 2009, during Judge Lindsay's prolonged illness, Ahmed was sentenced by Judge Tauro to two years of probation of which six months were to be in home confinement, and he was ordered to provide 400 hours of free medical service as a condition of probation.[6] In addition, a fine of $20,000 was imposed together with forfeiture of $2.9 million. Ahmed specifically admitted in the plea agreement that $2.9 million was "subject to forfeiture on the grounds that it constitutes or was derived, directly or indirectly, from gross proceeds traceable to the commission of the offense charges [sic] in Count 12 of the Superseding Indictment."

## C.   *Procedural History of Administrative Proceedings*

On November 8, 2007, three days after his guilty plea, Ahmed received a letter from the National Heritage Insurance Co. ("NHIC"), a Medicare contractor, stating that Ahmed's Medicare Provider Transaction Access Numbers and billing privileges were being revoked on December 9, 2007 with an effective date of November 5, 2007, based on his conviction. The letter cited 42

---

[6] Although beyond the scope of the record, counsel for Ahmed reported at the motion hearing before me in this matter that the Massachusetts Board of Registration in Medicine, which administers the licensing of physicians for medical practice, has recently chosen not to revoke Ahmed's medical license.

C.F.R. § 424.535(a)(3)(i)(B), which permits revocation of a physician's Medicare enrollment and billing privileges if the physician "within the 10 years preceding enrollment or revalidation of enrollment, was convicted of a Federal or State felony offense that CMS has determined to be detrimental to the best interests of the program and its beneficiaries" under a specific subsection applicable to "[f]inancial crimes, such as extortion, embezzlement, income tax evasion, insurance fraud and other similar crimes for which the individual was convicted, including guilty pleas and adjudicated pretrial diversion."

On December 13, 2007, Ahmed requested reconsideration of the revocation of his Medicare billing privileges by a NHIC hearing officer who issued a decision sustaining the revocation on March 12, 2008.  On May 9, 2008, Ahmed requested a hearing before an HHS administrative law judge ("ALJ"), who issued a decision on November 14, 2008 affirming the revocation.  Ahmed then appealed the ALJ's decision to the DAB, and on July 2, 2009, the DAB issued its Final Decision, affirming the ALJ decision to uphold the revocation of Ahmed's Medicare billing privileges.  The DAB's decision effectively became the final decision of the Secretary subject to judicial review.  42 C.F.R. § 498.90.

On August 31, 2009, Ahmed filed the complaint now before me, alleging that the Secretary's revocation of his Medicare enrollment violated the Administrative Procedure Act ("APA"), the

-8-

Medicare Act, and due process.  He seeks the following relief:
that the DAB decision be set aside, that his enrollment in the
Medicare program be reinstated, and that he be reimbursed for
Medicare services provided during the revocation period.

## II. STANDARD OF REVIEW

Any Medicare provider or supplier whose billing privileges
are revoked may have a hearing and judicial review under Section
1866(j) of the Social Security Act, codified in 42 U.S.C. §
1395cc(j).  *See* 42 C.F.R. § 498.1(g).  Judicial review of the
Secretary's final decision proceeds pursuant to 42 U.S.C. §
405(g).  *See* 42 U.S.C. §§ 1395cc(h)(1)(A), (j)(2).[7]

Under the review provision, the district court has the
"power to enter, upon the pleadings and transcript of the record,
a judgment affirming, modifying, or reversing the decision of the
[Secretary], with or without remanding the cause for a
rehearing."  § 405(g).[8]  The Secretary's findings "as to any
fact, if supported by substantial evidence, shall be conclusive,"
*id.*, and must be upheld "if a reasonable mind, reviewing the

_____

[7] When applying Section 405(g) to Medicare disputes, the
references therein to the Commissioner of Social Security or the
Social Security Administration are considered references to the
Secretary or HHS, respectively.  42 U.S.C. § 1395cc(h)(1)(A).

[8] Although his Complaint separately relies on the
Administrative Procedure Act ("APA"), 5 U.S.C. § 551, Ahmed
apparently agrees with the Secretary that the proper standard of
review in this matter is set forth in 42 U.S.C. § 405.  His APA
claim (Count I) is not mentioned in his motion briefing and,
consequently, I consider that separate claim to be abandoned.

evidence in the record as a whole, could accept it as adequate to support his conclusion." *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981).  Questions of law, however, are reviewed de novo.  *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001).

### III. DISCUSSION

In order for the Secretary to revoke Ahmed's billing privileges properly under § 424.535(a)(3), two conditions must be satisfied:  first, the supplier must have been convicted of a designated federal or state felony offense that CMS has determined to be detrimental to the best interests of the Medicare program and its beneficiaries, and second, the conviction must have occurred within the ten years preceding enrollment or revalidation of enrollment.  Ahmed challenges the Secretary's decision to revoke his Medicare billing privileges on the grounds that neither condition was met, and that the decision violated his due process rights.  I review the Secretary's decision against this challenge and assess whether it is supported by substantial evidence and is legally correct.

### A.   *Relevant Criminal Conduct*

#### 1.   The Designated Crimes

Ahmed argues that CMS improperly revoked his Medicare enrollment and billing privileges based on the "erroneous conclusion" that his conviction for obstruction constituted a

"financial crime" under 42 C.F.R. § 424.535(a)(3)(i)(B).[9]  That regulation designates "[f]inancial crimes, such as extortion, embezzlement, income tax evasion, insurance fraud and other similar crimes" as offenses that "CMS has determined to be detrimental to the best interests of the [Medicare] program and its beneficiaries."  § 424.535(a)(3)(i)(B).  Obstruction of a criminal investigation of a health care offense, he suggests, is not such an offense.

Ahmed attempts to distinguish his felony conviction for obstruction of the criminal investigation of a health care offense from the four financial crimes listed in the regulation, each of which purportedly require a showing of actual or intended financial harm to another.  I agree with the Secretary, however, that the regulation should not be interpreted so narrowly.[10]  The

_____

[9] I focus only on the terms of § 424.535(a)(3)(i)(B) because this is the only provision relied upon by the decisionmakers in the administrative process.  I note, however, that the broad catchall for any "felony offense that CMS has determined to be detrimental to the interests of the program and its beneficiaries," 42 C.F.R. § 424.535(a)(3), could arguably be read to provide a basis for revocation on its own without addressing the particularized offenses which "include" (but are not necessarily limited to) such offenses as those comprising § 424.535(a)(3).

[10] In my review of the Secretary's decision, I am obligated to give controlling weight to her interpretation of the regulations promulgated by HHS, so long as it is not arbitrary, capricious or manifestly contrary to the authorizing statute. *Chevron U.S.A. v. Nat'l Res. Def. Council*, 467 U.S. 837, 843-44 (1984); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994); *Martin v. Occupation Safety & Health Rev. Comm.*, 499 U.S. 144 (1991).  As will appear below, I find no need to rely upon

-11-

regulation uses nonexclusive, illustrative language to enumerate the various felony convictions that permit revocation of Medicare privileges: "[o]ffenses *include* . . . [f]inancial crimes, *such as* extortion, embezzlement, income tax evasion, insurance fraud *and other similar crimes* . . . ." *Id.* (emphasis added). The DAB concluded – in my view, correctly – that Ahmed's conviction under § 1518 was "similar" to the listed financial crimes, specifically insurance fraud.

The obstruction charge for which Ahmed was convicted is a criminal offense that bears the DNA of insurance fraud in the health care setting. Ahmed created and submitted false documents that could support claims for Medicare coverage of his patients' IVIg treatments. The DAB properly concluded that this conduct, as does insurance fraud, "involves a false statement or misrepresentation in connection with a claim or application for insurance or insurance benefits." Moreover, as recited in the DAB decision, Ahmed stated in briefing to the ALJ that he had "placed false letters and immunopathology reports into his patients' files to bolster the reimbursements he received from Medicare." The offense involves the cover up dimension of criminal conduct striking at the essential financial integrity of

principles of *Chevron* deference because I find the Secretary's interpretations of the relevant regulation coincide with my own.

the Medicare insurance program.[11]  Ahmed sought to throw investigators off the scent in their pursuit of a core financial fraud.  It is not merely similar to insurance fraud; it is of a piece with it.

    2.  <u>Regulatory Revocation Versus Statutory Exclusion</u>

Ahmed also relies on the separate Medicare participation exclusion statute to distinguish obstruction from financial crimes.  *See* 42 U.S.C. § 1320a-7.  The "mandatory exclusion" provision requires the Secretary to exclude individuals who were convicted of certain crimes, including "*a felony relating to fraud,* theft, embezzlement, breach of fiduciary responsibility, *or other financial misconduct*," from participation in Medicare. § 1320a-7(a)(3) (emphasis added).  Under the "permissive exclusion" provision, by contrast, the Secretary *may* exclude individuals who have been "convicted, under Federal or State law, in connection with the interference with or *obstruction of any investigation* into" certain criminal offenses, including health care fraud.  § 1320a-7(b)(2) (emphasis added).  Ahmed contends that "Congress's deliberate, separate treatment of obstruction of justice demonstrates that NHIC may not view Dr. Ahmed's actions

---

[11] There does not appear to be dispute, nor is it material, that Ahmed performed services for his patients and that there was a medical basis for such services. Rather, the issue is whether he could properly bill Medicare for those services.  Ahmed plainly knew that he could not and embarked on a fraudulent and obstructive scheme in an effort to "bolster" his claims of entitlement to reimbursement.

as falling into the category of 'financial crimes' set forth in 42 CFR § 424.535(a)(3)(i)(B) and should not automatically revoke his privileges on that basis."

I reject Ahmed's argument because, as the DAB correctly explained, the regulatory revocation under § 424.535 and the statutory exclusion under § 1320a-7 are "distinct remedial tools, each with its own set of prerequisites and consequences."[12]

Under the revocation provision, the physician is barred from participating in Medicare from the effective date of the revocation until the end of the re-enrollment bar, which ranges between one and three years depending on the severity of the basis for revocation.  § 424.535(c).  To re-enroll after revocation, the physician must complete and submit a new enrollment application and applicable documentation as a new supplier for validation by CMS.  § 424.535(d)(1).[13]

The exclusion of a physician from participation in Medicare also has a finite time period, but the duration of exclusion

---

[12] Although beyond the scope of the record, counsel for Ahmed reported at the hearing in this matter that the Secretary has chosen not to use the remedial tool of exclusion with respect to Ahmed.

[13] The Record does not indicate the duration of Ahmed's re-enrollment bar apparently because the relevant regulations were silent as to the maximum term of revocation.  In any event, assuming the three-year maximum is applied here, Ahmed could commence the re-enrollment process on December 8, 2010.  Nevertheless, Ahmed's conviction will remain a grounds for denial of re-enrollment until November 5, 2017, ten years following his conviction.

differs depending on the crime committed.  For mandatory exclusion under § 1320a-7(a)(3) based on a felony conviction relating to health care fraud, the minimum period of exclusion is not less than five years.[14]  § 1320a-7(c)(3)(B).  For permissive exclusion under § 1320a-7(b)(2) for a conviction relating to obstruction of an investigation, the exclusion period is three years, "unless the Secretary determines in accordance with published regulations that a shorter period is appropriate because of mitigating circumstances or that a longer period is appropriate because of aggravating circumstances."  § 1320a-7(c)(3)(D).  At the end of the exclusion period, the physician may apply to the Secretary for termination of the exclusion, or the Secretary may terminate the exclusion in certain instances. §§ 1320a-7(g)(1)-(2).

Although there are a variety of differences in details, a primary difference between revocation and exclusion appears to be in the collateral consequences.  Revocation bars a supplier from participation in the Medicare program.  42 C.F.R. § 424.535.

---

[14] There is an exception to the statutory minimum, however, when "upon the request of the administrator of a Federal health care program . . . who determines that the exclusion would impose a hardship on [certain] individuals . . . the Secretary may, after consulting with the Inspector General of the Department of Health and Human Services, waive the exclusion under subsection . . . (a)(3) . . . with respect to that program in the case of an individual or entity that is the sole community physician or sole source of essential specialized services in a community."  42 U.S.C. § 1320a-7(c)(3)(B).

Exclusion extends beyond Medicare to Medicaid and all other federal health care programs.  42 U.S.C. § 1320a-7.  "Federal health care program" is defined as "any plan or program providing health care benefits, whether directly through insurance or otherwise, that is funded directly, in whole or part, by the United States Government. . . or any State health care program. . . ."  42 C.F.R. § 1001.2.

  3.   Detrimental to the Best Interests of Medicare

    In the final analysis, even if Ahmed's felony conviction is somehow conceived as not expressly financial in nature, I am persuaded that his admitted obstruction of a criminal investigation of a health care offense here is the type of similar felony that CMS would properly consider "to be detrimental to the best interests" of Medicare and its beneficiaries because of its financial implications.  *See* § 424.535(a)(3).  Significantly, as the DAB noted, Ahmed pled guilty to obstruction of a *health care fraud* investigation, not a generic obstruction charge, and his offense was "inextricably linked to Medicare's finances," as evidenced by Ahmed's forfeiture of $2.9 million to the federal government.  In his plea agreement, Ahmed specifically admitted that $2.9 million was "subject to forfeiture on the grounds that it *constitutes, or was derived, directly or indirectly, from gross proceeds traceable to the commission of the [obstruction] offense* . . . ."  (emphasis

added).   Indeed, in his Sentencing Memorandum, to which his counsel has directed reference, *see* Note 1 *supra*, Ahmed agreed "that Medicare paid $5,418,601.07 for the IVIg treatment of patients for whom Dr. Ahmed created false letters and immunopathology reports."   Although Ahmed now contends that forfeiture "does not transform his conviction for obstruction into a financial crime," the specific circumstances of the underlying criminal proceeding, as underscored by his admissions in that proceeding, prove otherwise.

I therefore conclude, as a substantive matter, that substantial evidence supports the Secretary's determination that Ahmed's conviction under § 1518 fell within the scope of relevant financial crimes detrimental to the best interests of Medicare and that the Secretary applied the correct construction of her regulations in reaching this conclusion.

## B.   *Revalidation*

Ahmed next argues that even if the Secretary properly determined that he committed a relevant crime, she should not have revoked his Medicare privileges without first engaging in some sort of revalidation process.   To revoke Ahmed's Medicare billing privileges, his felony conviction must have occurred "within the 10 years preceding enrollment or revalidation of enrollment."   § 424.535(a)(3).   Neither party disputes that Ahmed's initial enrollment in Medicare occurred over ten years

before his felony conviction.   Therefore, the issue is whether revalidation occurred.

Section 424.515 outlines two types of revalidations.   First, a provider or supplier "must resubmit and recertify the accuracy of its enrollment information every 5 years," and they "are required to complete the applicable enrollment application." § 424.515.[15]   Second, "CMS reserves the right to perform off cycle revalidations in addition to the regular 5-year revalidations and may request that a provider or supplier recertify the accuracy of the enrollment information when warranted to assess and confirm the validity of the enrollment information maintained by CMS." § 424.515(d).

Ahmed contends that, in the three days between his guilty plea on November 5, 2007 and the revocation of his billing privileges on November 8, no event occurred "that would qualify as an 'enrollment' or 'revalidation' proceeding."   However, he erroneously imports a "proceeding" requirement into the regulation where no such language exists.   As the DAB correctly noted, "section 424.535(a)(3) does not require CMS (or its contractor) to notify a supplier that revocation is being contemplated, nor does it require CMS to allow the supplier an

---

[15] At the motion hearing before me, the parties were unable to represent whether or not Ahmed had actually resubmitted and recertified the accuracy of his enrollment information within the last five years.

opportunity to petition against a proposed or contemplated revocation." Rather, the DAB has consistently interpreted revalidation as "a process that involves not only the submission of information by the participant, but CMS *verification* of continued eligibility for enrollment." *Robert F. Tzeng, M.D.*, DAB No. 2169, at 11 (Apr. 3, 2008) (emphasis in original). Revalidation has occurred, for example, when the CMS contractor obtains information that the physician was convicted of a felony offense, at which point the contractor is "authorized to make the determination to revoke [the physician's] enrollment and billing privileges." *Mikhail Strutsovskiy, M.D.*, DAB No. CR2109, at 8 (Apr. 9, 2010); *see also Tzeng*, DAB No. 2169, at 11 ("Because the acquisition and review of information about a prior conviction was undertaken to verify Dr. Tzeng's continued eligibility for enrollment in Medicare, that exercise was an attempt to revalidate his enrollment.").

Moreover, the DAB has rejected the suggestion that "revalidation does not occur unless or until CMS requests revalidation" because "section 424.535(a)(3) does not require that the disqualifying conviction occur within 10 years preceding a *request* for revalidation. It merely provides that the conviction must have occurred within 10 years preceding 'revalidation.'" *Id.* at 11-12 (emphasis in original). Ahmed disputes the Secretary's interpretation "because the regulations

do not flesh out what is required for a 'revalidation,' [and] that gives CMS the ability to call any act a revalidation." Specifically, Ahmed objects to the conclusion that "even the passive act of receiving information that a physician was convicted of a felony can constitute revalidation" because that "nonsensical" reading would render the revalidation requirement meaningless.  I find, to the contrary, that § 424.515 expressly provides for event-triggered revalidation: "[o]ff cycle revalidations may be triggered as a result of random checks, information indicating local health care fraud problems, national initiatives, complaints, or other reasons that cause CMS to question the compliance of the provider or supplier with Medicare enrollment requirements."  § 424.515(d)(1).  That is precisely what happened here and it made a great deal of sense.

Ahmed's conviction triggered an off-cycle revalidation in November 2007, when CMS and/or NHIC acquired or reviewed information that Ahmed had pled guilty to a felony related to health care reimbursement.  The deliberative process did not end there because the felony conviction did not automatically require revocation; rather the regulation *permits*, but does not require, revocation if a physician is convicted of specified felonies.  § 424.535(a) ("CMS *may* revoke a currently enrolled provider or supplier's Medicare billing privileges . . . for the following reasons. . . .") (emphasis added).  The revocation based on

Ahmed's felony conviction was assessed by three successive layers of administrative decisionmakers before reaching finality with the DAB decision.  Ahmed was afforded the opportunity to submit materials he believed to bear upon the decision.  Given the circumstances, those decisionmakers understandably did not consider Ahmed's several arguments against revocation compelling. I therefore conclude that the revocation of Ahmed's privileges was well within the Secretary's authority as a procedural matter.

## C.   *Due Process*

More broadly, Ahmed contends that his due process rights were violated because a revalidation process did not occur *before* CMS and/or NHIC made the revocation decision.  He insists that revalidation is "an important procedural safeguard that provides Medicare participants and their patients with notice and an opportunity to be heard before a provider's billing privileges are revoked."  Ahmed claims that if given that opportunity, he would have clarified "the true circumstances of his crime" and demonstrated "that his Medicare patients had access to few, if any, comparable treatment sources."

The constitutional right to due process requires notice and a meaningful opportunity to respond.  *Chmielinski v. Massachusetts*, 513 F.3d 309, 316 (1st Cir. 2008).  Both of these requirements were met in this case.

With respect to notice, Ahmed received a letter from NHIC on November 8, 2007 before his billing privileges were revoked on December 9, 2007.  That letter also detailed an opportunity for Ahmed to obtain "an independent review" by requesting "an on-the-record reconsideration."

With respect to a meaningful opportunity to respond, the Supreme Court "has recognized, on many occasions, that . . . where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."  *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (unanimous).  "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation."  *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (unanimous).  Substantial assurance that the deprivation was warranted may occur when "an independent third party has determined that there is probable cause to believe the [individual] committed a serious crime."  *Gilbert*, 520 U.S. at 934; *cf. Guillemard-Ginorio v. Contreras Gomez*, 161 F. App'x 24, 29 (1st Cir. 2005) (per curiam).  Once Ahmed was convicted of a crime manifesting an intent to manipulate the Medicare reimbursement system and to obstruct the criminal justice system which polices it, there was more than adequate need for prompt action to revoke his privileges to participate in the system.

An elaborate pre-revocation process before the initiation of a felony-based revocation is not required for those convicted, as Ahmed was, of any felony within the terms of § 424.535(a)(3). The regulation specifically recognizes such circumstances are exceptional by providing that when a "provider or supplier is determined not to be in compliance with the enrollment requirements . . . [a]ll providers and suppliers are granted an opportunity to correct the deficient compliance requirement before a final determination to revoke billing privileges, *except for those imposed under paragraph* (a)(2), *(a)(3)*, or (a)(5) of this section." § 424.535(a)(1) (emphasis added).  Thus, the regulation expressly rejects pre-revocation process for physicians, like Ahmed, whose billing privileges are revoked due to a felony conviction within the scope of § 424.535(a)(3).  The sole remedies are post-revocation administrative and judicial review, which have been pursued vigorously by Ahmed through all their layers and fully satisfy his constitutional right to due process.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Defendant's motion (Doc. No. 11) for judgment on the pleadings, or in the alternative, for summary judgment.  I DENY the Plaintiff's cross-motion (Doc. No. 14) for judgment on the pleadings.

**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE